FILED
2018 Aug-13  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
## Southern Division

| | |
|---|---|
| ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, as securities intermediary for LIFE PARTNERS POSITION HOLDER TRUST, on behalf of itself and all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| PROTECTIVE LIFE INSURANCE COMPANY, | |
| Defendant. | |

Plaintiff Advance Trust & Life Escrow Services, LTA, as securities intermediary of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant Protective Life Insurance Company ("Protective Life"), states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and similarly situated owners of life insurance policies issued by Protective Life. Plaintiff seeks to represent a class of Protective Life policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by Protective Life.

2. The policies at issue in this case are universal life policies issued on standardized form contracts by Protective Life. Universal life ("UL") policies combine death benefits with a

1

savings or investment component, often known as the "account value" or "policy value." A key feature of such policies is the "unbundling" or "transparency" of the various charges and credits. This means that the monthly deductions are broken down into an array of discrete charges and credits: the COI charges, other contractually-specified costs, and crediting rates. The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy are separated, permitting each part to be independently analyzed." The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk. It is also referred to in the industry as the "mortality charge" or the "pure cost of protection." The savings component, as discussed in more detail herein, allows policyholders to use their policies as tax-advantaged savings vehicles and earn interest on the policy value.

3. Because COI charges are intended to compensate the insurer for mortality risk (i.e., the expected probability that the insured will die in a particular policy year), they are determined by the insurer based on its expectations of future mortality experience. After issuance, an insurer is required to periodically review the COI rates to confirm that they correctly capture the insurer's projected mortality costs. When mortality rates are projected to decline, the COI rates are required to be reduced. If mortality rates are projected to increase, the insurer may have the discretion to increase COI rates, subject to guaranteed maximum rates and other requirements and constraints.

4. This principle is inherent in the meaning of "cost of insurance," and is further embodied in the plain language of the policies at issue in this case, each of which expressly states that COI rates "will be determined by us, based on our expectations as to future mortality experience"—and nothing else. Protective Life imposes other charges through which it recoups

administrative costs and earns a profit, such as a premium expense charge of 4.50% of each premium collected and an administrative expense charge.

5.  Policyholders' comfort with this arrangement is due to their trust—and the insurer's contractual commitment—that the insurer will dutifully decrease COI rates to reflect improved projected mortality experience. Protective Life, however, has been abusing this trust and breaching its contractual commitment. In the face of decades of improving mortality rates in the time since the subject policies were issued, Protective Life has not reduced COI rates.  Rather, it has kept the same rate scale since at least *1986*.  In doing so, Protective Life has converted COI charges from a cost-recovery mechanism into a profit vehicle. By retaining the difference between its projected mortality expenses and the COI rates charged to policyholders, Protective Life has earned tens—if not hundreds—of millions of dollars in extra profit over the past decade.

6.  That mortality expectations have improved significantly over the past several decades is now well-documented, and this trend is widely projected by the life insurance industry to continue. Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary (CSO) mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.  The policies at issue in this case each reference the 1980 CSO Mortality Table as the basis of policy values.  Since that table was introduced, the Society of Actuaries (SOA) and the American Academy of Actuaries (the "Academy") have periodically published, from surveys of life insurers, new tables showing consistent and significant mortality improvement.  The Academy's 2001 report, for example, observed:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . .

> [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

In October 2015, the Academy released a new CSO table and report, observing that mortality had continued to improve from the 2001 CSO Table:

> At the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) have collaborated to create new Valuation Basic Tables (VBT), Relative Risk tables (RR), and Commissioners Standard Ordinary Mortality Tables (CSO). The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. *Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development*.[1]

7. In the face of the substantially improved mortality expectations that have benefited Protective Life, it is apparent that Protective Life has wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates if there were to be an unexpected pandemic that made mortality expectations worse than anticipated, but not requiring it to *decrease* COI rates in the face of years and years of improved mortality expectations—an improvement that has, in fact, already occurred.  Protective Life's position has no merit and breaches the terms of the insurance policies.

8. Protective Life is also wrongly "basing" its COI rates on factors not permitted by the contract—i.e., factors other than its "expectations as to future mortality experience." Each year, insurers are required to file an actuarial opinion with the National Association of Insurance Commissioners and state regulators regarding non-guaranteed elements.  This opinion is referred to as Annual Statement Exhibit 5 Interrogatories ("Interrogatories").   Protective Life's Interrogatories for each of 2015, 2016, and 2017 state as follows: "Universal Life policies have mortality charges and expense charges which are not guaranteed.  These mortality charges are

---

[1] https://www.soa.org/Files/Research/Exp-Study/research-2017-cso-report.pdf.

initially set and subject to review using currently experience intercompany and company mortality, along with company experience, ***including but not limited to expense and lapse***." But "expense and lapse" are not factors on which COI charges can be based under the terms of the policies. Upon information and belief, Protective Life has also embedded a profit margin into COI rates in violation of the plain language of the policies.

9.  In sum, Protective Life has violated the terms of the Subject Policies by failing to base cost of insurance rates on its expectations as to future mortality experience, and instead using cost of insurance charges as a way to bolster its profits. As a result of this misconduct, Plaintiff seeks, among other things, monetary relief for the COI overcharges that Protective Life has wrongly imposed and continues to impose on its customers.

## THE PARTIES

10.  Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1401 New Road, Suite 200, Waco, Texas 76711. Plaintiff is suing in its capacity as securities intermediary of Life Partners Position Holder Trust and is the owner of the following Protective Life policies:

- Policy No. B00087535 (Issue Date: 9/15/1986; Initial Face Amount: $100,000)
- Policy No. B00308093 (Issue Date: 5/2/1999; Initial Face Amount: $500,000)
- Policy No. B00394328 (Issue Date: 3/1/2005; Initial Face Amount: $500,000)
- Policy No. B00300844 (Issue Date: 6/2/1998; Initial Face Amount: $1,000,000)

To Plaintiff's knowledge, Protective Life has never adjusted COI rates on the above policies.

11.  Defendant Protective Life Insurance Company is a corporation organized and existing under the laws of Tennessee and has its principal place of business in Birmingham, Alabama.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13. This Court has personal jurisdiction over Protective Life because it has its principal place of business in Birmingham, Alabama.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to Plaintiff's cause of action occurred in this District, including Protective Life's determination of COI rates.

**FACTUAL BACKGROUND**

A.   **The Policies at Issue**

15. The policies at issue are all flexible-premium, UL policies issued by Protective Life in the 1980s, 1990s, and/or 2000s (the "Subject Policies"). They were all issued on the same standardized policy forms and insureds are not permitted to negotiate different terms. Exhibit A to this Complaint is a representative policy (Policy #B00087535), redacted for personal information.

16. UL policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain

other specified expenses. The COI charge is deducted from the policy value (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Protective Life. Any premiums paid in excess of COI charges and other charges are applied to the policy value.  These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

17. The COI charge is part of the insurance component of a UL policy.  It is supposed to be the insurer's cost of providing mortality coverage. The size of the COI charge is highly significant to universal life policyholders.  First, it dictates the minimum amount of money that must be paid to keep a policy in force.  Second, high COI rates can quickly diminish policy value and reduce the amount of money on which interest can be earned.  Absent a secondary guarantee, if the policy value diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse.  Third, higher current and illustrated future COI rates reduce the value of a policy in the secondary and tertiary markets.

18. The COI provision in each of the Subject Policies is as follows:

> **Cost of Insurance Rates.**  … Monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality experience. Any change in the monthly cost of insurance rates will be on a uniform basis for insureds of the same class such as age, sex, rate class, and policy year. However, the cost of insurance rates will not be greater than those in the Table of Guaranteed Maximum Insurance Rates, shown in the Policy Schedule.

This policy language provides that the *only* factor that Protective Life can and must consider when determining COI rates are "expectations as to future mortality experience."  Nothing else.  Because

7

the COI rates on the Subject Policies must be based solely on expectations as to future mortality experience, COI rates must be adjusted downward if those expectations improve.

19. Protective Life imposes other charges through which it recovers administrative expenses and earns a profit. This includes premium expense charges of 4.5-5% of all premiums and a monthly administrative expense charge. This means that the Subject Policies are "fully unbundled": each component of the policy has a separate charge. Protective Life also profits from the interest spread it earns on policyholders' policy values (i.e., the difference between interest earned by Protective Life on policy accounts and the amount of interest credited to policy accounts). Protective unbundles these charges and refers to cost of insurance charges as "Mortality Charges" in its Annual Reports to policy holders, for example the policy in Exhibit A promises to send the policy holder an Annual Report each year. Protective Life provided Annual Reports to the Plaintiff for this policy including Annual Reports for the periods to 09/15/2013, 09/15/2014, 09/15/2015, 09/15/2016 and 09/15 2017. In each of these reports Protective Life enumerated the charges that were deducted against the policy. The reports showed separately deductions for three charges: i) "Mortality Charge", ii) "Rider Cost" and iii) "Admin Charges". The report explains that Admin Charges are for policy fees, premium expense charges, monthly expense charges and charges due to increases in insurance amount. The "Rider Cost" is for a Disability Benefit Rider and the cost of insurance deductions and nothing else are shown under the heading "Mortality Charge" in the Annual Reports.

20. Protective Life has issued other insurance policies that do not require it to base its COI rates on mortality alone when that is its intention, including a *later* version of this *same* product. For example Protective Life received permission from regulators to *change* the policy form for a different version of the policy owned by Plaintiff. This form provided that: "Monthly

cost of insurance rates will be determined by the Company, based on its expectations as to future mortality experience, **investment earnings, persistency, and expenses (including taxes)."** (emphasis added).  This is what is known as a Multi-Factor COI Provision, as it allows the insurer to base COI rates on factors other than pure mortality, and converts the COI charge from a "pure mortality charge" to a "mortality plus charge."  The Subject Policies all contain Single-Factor COI Provisions: no factor other than mortality may be considered.

### B. Protective Life Fails to Reduce COI Rates Despite Continued Mortality Improvement Over the Course of Three Decades

21. A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand.  Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since underwriting.  Mortality tables are used by actuaries to calculate insurance rates and are designed to reflect mortality rate expectations.

22. The Subject Policies were priced at a time when the current CSO table in use was the 1980 CSO Mortality Table, but the 2001 CSO Mortality Table has showed strong mortality improvements, particularly at older ages, over the 1980 CSO table.[2] The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table."  This means the tables are showing a substantial *improvement* in mortality in a 20-year time period.  These mortality improvements represent a substantial financial benefit that Protective Life should have

---

[2] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2_june01.pdf.

passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table").

23.     Since the 2001 CSO Mortality Table was introduced, the SOA has continued to conduct surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90. For example, the SOA published Individual Life Experience Reports for the periods 2002-2004; 2005-2007 and 2008-2009 each noting strong rates of improvement in mortality. Protective Life was one of the surveyed companies included in each of these studies. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008 Valuation Basic Table, and (d) 2015 Valuation Basic Table. Each of these updates confirms that mortality had continued to significantly improve from the 2001 CSO Table. Other surveys have also noted mortality improvements. In May 2013 the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements. The report was based on a survey of insurance companies – including Protective Life. In March 2014 the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over 2001 VBT. Their report was based on a survey of insurance companies – including Protective Life.

24.     Despite this industry-wide improvement in mortality rates—and corresponding decrease in the cost of providing mortality coverage—Protective Life has never decreased its COI rates for the Subject Policies.

25. Protective Life has also concealed its wrongdoing: the monthly COI rates used to calculate COI charges are not disclosed to policyholders, nor are Protective Life's mortality expectations. Protective Life's regulatory filings, however, when read by an experienced insurance professional, reveal that Protective Life is using improper factors in setting COI Rates. Protective Life's statutory filings indicate that it believes that "expenses" and "lapses" can be considered in setting mortality charges. For example, Interrogatories to Protective Life's 2017 Annual Report states as follows:

> Universal Life policies have mortality charges and expense charges which are not guaranteed. These mortality charges are initially set and subject to review using currently experienced intercompany and company mortality, along with company experience, including but not limited to expense and lapse.

26. "Expense and lapse," of course, are not "expectations as to future mortality experience" and therefore are not permissible considerations in determining mortality charges. In fact, Protective Life later *changed* its policy form to permit it to consider lapse (also called "persistency" by Protective Life) and expenses: "Monthly cost of insurance rates will be determined by the Company, based on its expectations as to future mortality experience, investment earnings, **persistency, and expenses** (including taxes)." (emphasis added). But under the policy language for the Subject Policies, Protective Life is prohibited from doing that. By using "expense and lapse" in setting COI rates, Protective Life has breached the terms of the Subject Policies. Upon information and belief, Protective Life has also added a profit margin to mortality rates—a practice known as "loading"—in violation of the Subject Policies.

## CLASS ACTION ALLEGATIONS

27. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to as the "COI Overcharge Class"—consists of:

> All owners of universal life (including variable universal life) insurance policies issued or administered by Protective Life Insurance Company, or its predecessors in interest, that provide that cost of insurance rates are determined based on expectations as to future mortality experience.

The COI Overcharge Class does not include defendant Protective Life, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

28. The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Protective Life.

29. The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

30. The Plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the class.

31. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

32. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

33. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether Protective Life's actions in failing to decrease the cost of insurance charges imposed on the COI Overcharge Class violated the terms of those form policies;

(c) whether Protective Life based its COI charges on factors other than expectations as to future mortality experience;

(d) whether Protective Life breached its contracts with Plaintiff and members of the class;

(f) whether Protective Life's expectations as to future mortality experience have improved; and

(g) whether Plaintiff and members of the class are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

34. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when Protective Life's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and Protective Life's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

35. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the COI Overcharge Class.

36. The Subject Policies are binding and enforceable contracts.

37. Protective Life breached its contracts with Plaintiff and the COI Overcharge Class by deducting COI charges calculated from COI rates not based on its expectations as to future mortality experience. These overcharges include, but are not limited to, the excess COI charges that Protective Life deducted by not reducing COI rates based on improved mortality.

38. Protective Life's use of factors other than expectations as to future mortality alone also breaches the policy.

39. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Protective Life's conduct as set forth herein.

40. As a direct and proximate cause of Protective Life's material breaches of the policies, Plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the COI Overcharge Class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the class compensatory damages;

3. Awarding Plaintiff and the class pre-judgment and post-judgment interest, as well as costs; and

4. Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated:  August 13, 2018                     Respectfully submitted,

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale (RAG003)
Meghan A. Salvati (SAL035)

**OF COUNSEL:**

**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
P.O. Box 55727
Birmingham, AL 3525505727
Tel.:  (205) 930-5100
Fax:   (205) 930-5101
bragsdale@sirote.com
msalvati@sirote.com

Steven G. Sklaver
(*pro hac vice* application to be filed)
Glenn C. Bridgman
(*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:    310-789-3100
Fax:    310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com

Seth Ard
(*pro hac vice* application to be filed)
Ryan Kirkpatrick
(*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:    212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

*Attorneys for Plaintiff*