FILED
2019 Oct-02  PM 08:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, as securities intermediary for LIFE PARTNERS POSITION HOLDER TRUST, on behalf of itself and all others similarly situated, | Civil Action No. 2:18-cv-01290-KOB |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| PROTECTIVE LIFE INSURANCE COMPANY, | |
| Defendant. | |

Pursuant the Court's September 20, 2019 Order (Doc. 47) granting leave to amend, Plaintiff Advance Trust & Life Escrow Services, LTA, as securities intermediary of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its First Amended Complaint against defendant Protective Life Insurance Company ("Protective"), states as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of Plaintiff and similarly situated owners of life insurance policies issued by Protective.  Plaintiff seeks to represent a class of Protective policyholders who have been forced to pay monthly

unlawful and excessive cost of insurance ("COI") charges, deducted from their account values on a monthly basis, after August 13, 2012 (the "Class Period"), that are not, as the policies require, determined by Protective based on its expectations as to future mortality experience.

2.      Plaintiff and all members of the proposed class have been assessed COI charges on a monthly basis in 2018 that were calculated using COI rates that, in violation of the plain terms of the contract, were not based on Protective's current expectations as to future mortality experience. The monthly COI charges calculated anew each month and charged by Protective in 2017, 2016, 2015, 2014, 2013, and after August 13, 2012 also were not calculated using rates based on Protective's then-current expectations as to future mortality experience.

3.      The policies at issue in this case are universal life policies issued on standardized form contracts by Protective.  Universal life ("UL") policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value."  A key feature of such policies is the "unbundling" or "transparency" of the various charges and credits. This means that the monthly deductions are broken down into an array of discrete charges and credits: the COI charges, other contractually-specified costs, and crediting rates. The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy

are separated, permitting each part to be independently analyzed." The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk. It is also referred to by both Protective and the broader industry as the "mortality charge" or the "pure cost of protection." The savings component, as discussed in more detail herein, allows policyholders to use their policies as tax-advantaged savings vehicles and earn interest on the policy value.

4.      Cost of insurance rates are not fixed at issuance. Because COI charges are intended to compensate the insurer for mortality risk (i.e., the expected probability that the insured will die in a particular policy year), they are determined in the future by the insurer based on its expectations as to future mortality experience. Protective is required to periodically review the COI rates to confirm that they correctly capture the insurer's current mortality expectations. Protective acknowledges that it reviews its mortality continuously and conducts these COI rate redeterminations periodically, using its current mortality experience. *See* Protective's 2016 Annual Report to National Association of Insurance Commissioners ("Universal Life policies have mortality charges and expense charges which are not guaranteed. These mortality charges are initially set and **periodically redetermined** using **currently** experienced intercompany and company mortality, along with company experience including but not limited to expense and lapse."); *id.* 2017 ("Universal Life policies have mortality charges and

expense charges which are not guaranteed. These mortality charges are initially set and **subject to review** using **currently** experienced intercompany and company mortality, along with company experience including but not limited to expense and lapse."); Protective 2015 10-K ("For universal life products, assumptions are periodically updated whenever actual experience and/or expectations for the future differ from that assumed."); *id.* ("Assumptions regarding mortality, lapses, and interest rates are continuously reviewed and may be periodically changed"). Protective conducted these new periodic redeterminations, and continuous mortality review, during the Class Period.

5.     Protective also made annual certifications to the National Association of Insurance Regulators and various state regulators during the Class Period concerning whether its "anticipated experience" for mortality underlying its COI charges differs from its "current experience" of mortality.  This necessarily requires an analysis comparing current mortality rates, on which monthly COI rates are exclusively based, to emerging experience.  Protective's annual financial reporting, including its predictions of future cash flows, also incorporates updated expectations of future mortality experience.

6.     The Statement of Policy Cost and Benefits Information that Protective sent to policyholder, which purport to predict the future performance of the policy, specifically provided that (in capitalized lettering) that projected values "MAY

CHANGE WITH VARIATIONS IN . . . RISK CHARGES," and "YOUR ACTUAL COST MAY INCREASE OR DECREASE DEPENDING UPON FUTURE MORTALITY CHARGES." And the illustrations that Protective sends to policyholders confirm that COI rates are not only undetermined at issuance, but also highly likely to change:

> Non-guaranteed elements, such as interest and cost of insurance rates, are subject to change by the Company. This illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown. **This is not likely to occur**, and actual results may be **more or less favorable** than those shown.

7.     If a review shows that mortality rates are projected to decline, the monthly COI rates that Protective used to calculate the monthly COI charges must be reduced. This principle is inherent in the meaning of "cost of insurance," and is further embodied in the plain language of the policies at issue in this case, each of which expressly states that "[t]he cost of insurance is determined at the end of each policy month" and COI rates "will be determined by us, based on our expectations as to future mortality experience"—and nothing else.  Protective imposes other charges through which it recoups administrative costs and earns a profit, such as a premium expense charge of 4.50% of each premium collected and an administrative expense charge.

8.     But Plaintiff, along with numerous other Protective policyholders, has been subjected to unlawful monthly calculations and deductions from their account

value during the Class Period and forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts. In fact, as each of the Annual Reports of the policies at issue show, Protective has determined and applied increased monthly COI charges every year for the past six years, and those COI charges deducted from Plaintiff's account value every month during the Class Period have not been calculated in compliance with the Protective's expectations of future mortality experience, as the policies require. These new mortality charges are so wildly divorced from current expectations of future mortality experience that, for one policy, the rates even exceed the maximum COI rates under the 2017 CSO Table – the most recent official industry-wide mortality table which itself is extremely conservative – which means the IRS would now deem such a policy to violate "reasonable mortality charge requirements."

9.      Despite its contractual commitment that monthly COI rates will be determined "based on our expectations as to future mortality experience," and despite the fact Protective has enjoyed significantly improved mortality experience and expectations during the Class Period, monthly COI rates have not been determined based on Protective's improving mortality expectations, and the results of Protective's new mortality reviews during the Class Period are being ignored to the detriment to the members of the Class.

10.     It is now well-documented that nationwide mortality expectations have *improved* significantly during the Class Period. The Society of Actuaries and the American Academy of Actuaries periodically publish mortality tables using information collected from America's largest insurers. Those tables show that mortality rates have improved at a rate of roughly 1% per year during the Class Period.

11.     That mortality expectations have also improved significantly over the past several decades is now well-documented, and this trend is widely projected by the life insurance industry to continue. Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary (CSO) mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.  The policies at issue in this case each reference the 1980 CSO Mortality Table as the basis of policy values.  Since that table was introduced, the Society of Actuaries (SOA) and the American Academy of Actuaries (the "Academy") have periodically published, from surveys of life insurers, new tables showing consistent and significant mortality improvement.  The Academy's 2001 report, for example, observed:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it

was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

12.     In October 2015, the Academy released a new CSO table and report, observing that mortality had continued to improve from the 2001 CSO Table:

> At the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) have collaborated to create new Valuation Basic Tables (VBT), Relative Risk tables (RR), and Commissioners Standard Ordinary Mortality Tables (CSO). The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. *Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development*.[1]

13.     Despite these annual reviews conducted during the Class Period which changed (that is, for Protective, resulted in improved) mortality expectations and corresponding decrease in mortality risk, Protective never determined its COI rates based on its updated mortality assumptions, which would have resulted in far lower rates than those charged. At the same time, Protective asserts the right—and many other insurers have exercised their right—to increase COI rates in the event that future experience is more adverse than assumed at pricing.  This is wrong: the requirement that rates "will be determined by us, based on our expectations as to future mortality experience" runs both ways, and Protective is only permitted to

---

[1] https://www.soa.org/Files/Research/Exp-Study/research-2017-cso-report.pdf.

charge COI rates that reflect its documented and expected costs of paying death benefits due under the policies.

14.    Protective is also wrongly "basing" its COI rates on factors not permitted by the contract—i.e., factors other than its "expectations as to future mortality experience." Each year, insurers are required to file an actuarial opinion with the National Association of Insurance Commissioners and state regulators regarding non-guaranteed elements.  This opinion is referred to as Annual Statement Exhibit 5 Interrogatories ("Interrogatories").  Protective's Interrogatories for 2016 stated: "Universal Life policies have mortality charges and expense charges which are not guaranteed.   These mortality charges are initially set and periodically redetermined using currently experience intercompany and company mortality, along with company experience, ***including but not limited to expense and lapse***." But "expense and lapse" are not factors on which COI charges can be based under the terms of the policies.  Upon information and belief, Protective has also embedded a profit margin into COI rates used to calculate COI charges on a monthly basis during the Class Period in violation of the plain language of the policies.

15.    In sum, during the Class Period, Protective has violated and continues to violate its contractual commitment to policyholders that its COI charges will be calculated monthly using rates that "will be determined" based on Protective's "expectations as to future mortality experience."  Protective has refused to decrease

COI rates despite its reviews during the Class Period concluding that it has improving future mortality expectations in each of those years. Plaintiff therefore seeks monetary relief for the COI overcharges that Protective has wrongly imposed on Plaintiff and the proposed Class during the Class Period.

16.    Each and every failure to calculate COI charges using rates that are based on Protective's "expectations of future mortality experience" during the Class Period constituted a discrete violation of the insurance contract in place at that time.  Each such failure to follow contractual mandates violated the contractual rights of plaintiff and all class members who owned an insurance policy in force at that time.

## THE PARTIES

17.    Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1401 New Road, Suite 200, Waco, Texas 76711.  Plaintiff is suing in its capacity as securities intermediary of Life Partners Position Holder Trust and is the owner of the following Protective policies:

- Policy No. B00087535 (Issue Date: 9/15/1986; Initial Face Amount: $100,000), which was issued in Georgia;

- Policy No. B00308093 (Issue Date: 5/2/1999; Initial Face Amount: $500,000), which was issued in North Carolina;

- Policy No. B00394328 (Issue Date: 3/1/2005; Initial Face Amount: $500,000), which was issued in Wisconsin; and

- Policy No. B00300844 (Issue Date: 6/2/1998; Initial Face Amount: $1,000,000), which was issued in Florida.

18.    Defendant Protective Life Insurance Company is a corporation organized and existing under the laws of Tennessee and has its principal place of business in Birmingham, Alabama.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one defendant and the aggregate amount of damages exceeds $5,000,000.   This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

20.    This Court has personal jurisdiction over Protective because it has its principal place of business in Birmingham, Alabama.

21.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to Plaintiff's cause of action occurred in this District, including Protective's determination of COI rates.

# FACTUAL BACKGROUND

## A.   The Policies at Issue

22.     The policies at issue are all flexible-premium, UL policies issued by Protective (the "Subject Policies").  They were all issued on the same standardized policy forms and insureds are not permitted to negotiate different terms.[2]

23.     UL policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value."  One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other

---

[2] Copies of each policy have previously been filed in this action.  *See, e.g.,* Doc. 31-1 (filed Nov. 19, 2018) at Exhibits 8-11. Policy number B00394328, which was issued in 2005, includes a COI rider with a ten-year window that expired in 2015, that provides as follows:

> In the "Cost of Insurance Rates" section in the Policy to which this endorsement is attached, we state that monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality experience.

> In setting these rates, we also take into account the portion of sales and underwriting expenses that are in excess of the expense charge that applies to the first twelve policy months. These expenses are included in the cost of insurance rates *for no more than the first ten policy years*.

> Any change in our scale of cost of insurance rates will be based solely on our expectations as to future mortality experience.

That Protective required a special rider in order to include anything other than mortality in its computation of COI rates, even for a short period of time, confirms that the COI rates must reflect mortality and mortality alone.

specified expenses. The COI charge is deducted from the policy value (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Protective. Any premiums paid in excess of COI charges and other charges are applied to the policy value.  These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

24.     The COI charge is supposed to be the insurer's cost of providing mortality coverage, and is designed to fluctuate depending on the insurer's projected mortality experience. The size of the COI charge is highly significant to universal life policyholders.  First, it dictates the minimum amount of money that must be paid to keep a policy in force.  Second, high COI rates can quickly diminish policy value and reduce the amount of money on which interest can be earned.  Absent a secondary guarantee, if the policy value diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse.  Third, higher current and illustrated future COI rates reduce the value of a policy in the secondary and tertiary markets.

25.    The cost of insurance charge ("COI charge" or "mortality charge") is calculated as follows:

> **Cost of Insurance**.  The cost of insurance is determined <u>at the end of each policy month</u> as follows:
>
> (1)    divide the death benefit at the beginning of the policy month by the sum of 1 plus the guaranteed interest rate;
> (2)    reduce the result by the amount of policy value {prior to deducting the cost of insurance) at the beginning of the policy month;
> (3)    multiply the difference by the <u>cost of insurance rate as described in the Cost of Insurance Rates section</u>.

The Subject Policies also provide that that monthly cost of insurance rates for any given sex, age, or rate class "will" be determined by Protective in accordance with its expectations as to future mortality experience, and only its expectations as to future mortality experience:

> **Cost of Insurance Rates**. The <u>monthly cost of Insurance rate</u> is based on the sex, attained age, and rate class of the Insured and on the policy year. <u>Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience</u>.  Any change in the monthly cost of insurance rates will be on a uniform basis for insureds of the same class such as age, sex, rate class, and policy year. However, the cost of insurance rates will not be greater than those in the Table of Guaranteed Maximum Insurance Rates, shown in the Policy Schedule.

26.    The COI Class Policies are known in the insurance industry as "Single Consideration Policies" because the only factor that the carrier can and must consider when determining monthly COI rates is "expectations as to future mortality experience."  Nothing else.  Because the cost of insurance on the Subject Policies

must be "determined at the end of each policy month" and the COI rates "will be determined" based solely on expectations as to future mortality experience, COI rates must be adjusted downward if those expectations improve following review. Protective imposes other charges through which it recovers administrative expenses and earns a profit.   This includes premium expense charges of 4.5-5% of all premiums and a monthly administrative expense charge.  This means that the Subject Policies are "fully unbundled": each component of the policy has a separate charge. Protective also profits from the interest spread it earns on policyholders' policy values (i.e., the difference between interest earned by Protective on policy accounts and the amount of interest credited to policy accounts).

27.    Protective unbundles all these charges and refers to cost of insurance charges as "Mortality Charges" in its Annual Reports to policy holders, and each of Plaintiff's policies provide that Protective will send the policy holder an Annual Report each year. Protective provided Annual Reports to the Plaintiff for the policy, including Annual Reports for the periods to 09/15/2013, 09/15/2014, 09/15/2015, 09/15/2016 and 09/15/2017. In each of these reports, Protective enumerated the charges that were deducted against the policy. The reports showed separately deductions for three charges: i) "Mortality Charge", ii) "Rider Cost", and iii) "Admin Charges". The report explains that "Admin Charges" are for policy fees, premium expense charges, monthly expense charges and charges due to increases in insurance

amount. The "Rider Cost" is for a Disability Benefit Rider. The COI deductions and nothing else are shown under the heading "Mortality Charge" in the Annual Reports.

28.     By contrast, Protective has issued other insurance policies that do not require it to base its COI rates on mortality alone when that is its intention, including a *later* version of this *same* product. For example Protective received permission from regulators to *change* the policy form for a different version of the policy owned by Plaintiff.   This form provided that: "Monthly cost of insurance rates will be determined by the Company, based on its expectations as to future mortality experience, **investment earnings, persistency, and expenses (including taxes)."** (emphasis added).  These types of policies are known in the insurance industry as Multi-Factor COI Provisions, because it allows the insurer to base COI rates on factors other than pure mortality, and converts the COI charge from a "pure mortality charge" to a "mortality plus charge."  The Subject Policies all contain Single-Factor COI Provisions: no factor other than mortality may be considered.

## B.     Protective Fails to Reduce COI Rates Despite Continued Mortality Improvement After August 13, 2012 and Continues to Increase both Monthly Mortality Charges and Monthly COI Rates

29.     During the Class Period, Protective periodically quantified its "expectations as to future mortality experience" and reviewed its COI rates.  In quantifying its future mortality expectations, Protective performs experience studies which examined its historical mortality experience and, from that mortality

experience, develop predictions of mortality it expects to see in the future.  These expectations are quantified by insurers in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand.  Separate tables can be produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting.  Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's then-current (that is, that year's) expectations as to future mortality experience.

30.     During the Class Period, Protective updated its expectations as to future mortality experience, first by reviewing its historical mortality experience (i.e., the actual deaths experienced in the prior year).  The actual mortality experience varied during the Class Period. Using that recent mortality experience, Protective "continuously reviewed" its mortality expectations during the Class Period and "periodically updated" those assumptions "whenever actual experience and/or expectations for the future differ from that assumed."  Protective then adjusts that raw experience (that is, whether each particular insured has died or not) to account

for its prediction of how future experience will differ to arrive at is then-expected future mortality experience.

31.    Life insurers, like Protective, have experienced dramatic improvements in mortality experience and mortality expectations in the past several decades. Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) began issuing a series of Commissioners Standard Ordinary (CSO) mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. CSO tables are also incorporated into I.R.S. regulations to define what constitutes "life insurance," what constitute "reasonable mortality charges," and what is deductible for federal tax purposes.

32.    The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table").  That table was the industry-standard table until 2001, and the Subject Policies were issued when that table was in effect.  In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table.  The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued.  The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

33.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table."  This means the tables are showing a substantial improvement in mortality in a 20-year time period.  These mortality improvements represent a substantial benefit that Protective should have passed on to policyholders.  The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

34.     Since the 2001 CSO Mortality Table was introduced, the SOA has continued to conduct surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90. For example, the SOA published Individual Life Experience Reports for the periods 2002-2004,2005-2007, and 2008-2009 each noting strong rates of improvement in mortality. Protective Life was one of the surveyed companies included in each of these studies. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates

they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table;(c) 2008 Valuation Basic Table; (d) 2015 Valuation Basic Table; and (e) the 2017 CSO Table. Each of these updates confirms that mortality had continued to significantly improve from the 2001 CSO Table. Other surveys have also noted mortality improvements. In May 2013, for example, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements. In March 2014, the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over prior years. Their report was based on a survey of insurance companies – including Protective.  And in 2017, the 2017 CSO Table took effect, again reflecting continued mortality improvement.

35.    Despite this industry-wide improvement in mortality rates—and corresponding decrease in the cost of providing mortality coverage—Protective did not determine COI rates a single time during the Class Period to reflect its updated expectations as to future mortality experience, and has never adjusted its COI rates downward to reflect its improving mortality expectations.

36.    The extent to which Protective is now overcharging policyholders is substantial.  Each month, Protective calculated the monthly "Mortality Charge" for

20

the representative policy, using varying COI rates. The monthly "Mortality Charge" on just that policy increased in the past five years over 57%, from $29.46 (9/15/13), to $33.20 (9/15/14), to $37.15 (9/15/15), to $41.16 (9/15/16), to $46.21 (9/15/17). The insured is a standard, non-smoker, male, 24 year old at issuance on September 15, 1986, which makes his attained age 53 years old as of September 15, 2016. Applying the mathematical formula on page 10 of the policy for the month ending 9/15/2015 from the Annual Report, results in a monthly COI rate of 43 cents per $1,000 of coverage.  By way of comparison, the maximum COI rate that Protective could charge Plaintiff under the 2017 CSO Table—the most recent industry mortality table, which is inherently more conservative than insurers' actual mortality expectations—is 25 cents per $1,000 of coverage.   The COI rates for the policy are 172% of the maximum rate that could be charged under CSO 2017.  This means that the rate that Protective is currently charging Plaintiff is so expensive that (a) it could not be used for a policy issued today under CSO 2017 and (b) under the IRS's latest guidelines, if the policy were issued after January 1, 2020, the IRS would deem such a policy to violate "reasonable mortality charge requirements" and would not permit it to be treated as a life insurance policy for federal tax purposes.[3]

---

[3] *See, e.g.,* I.R.S. Bulletin No. 2018-11 dated March 12, 2018, available at https://www.irs.gov/pub/irs-irbs/irb18-11.pdf (last visited October 2, 2018) ("The 2017 CSO tables became the prevailing commissioners' standard tables on January 1, 2017. For tax purposes, the 2017 CSO tables generally must be used for purposes of applying the reasonable mortality charge requirements of § 7702(c) (3)(B)(i) with regard to contracts issued on or after January 1, 2020. See Notice 2016– 63, 2016–45 I.R.B. 683.").

37.    Protective has also increased both mortality charges and monthly COI rates on Plaintiff's other policies. For Policy Number B000308093, monthly mortality charges have increased from $2,318.75 on May 2, 2013 to $5,127.62 on May 2, 2018, and monthly COI rates have more than doubled over those period.  For Policy Number B00394328, monthly mortality charges have increased from $1,868.00 in 2012 to $3,487.96 in 2017, and monthly COI rates have increased by 60%.  For Policy Number B00300844, monthly mortality charges have increased from $1,523.06 in October 2012 to $4,241.27 in June 2017, and monthly COI rates have increased 150%.

38.    The new rates currently being imposed on Plaintiff's policies were not fixed at policy issuance.  Each time Protective imposes a new COI rate as insured's age, that increase must be in conformity with the terms of the policy, including the requirement that such rates "will be determined…based on our expectations of future morality experience."  The COI rates imposed from August 13, 2012 to the present have not been determined on that basis.

39.    Protective's rate reviews also appear to include impermissible factors. Protective's 2016 National Association of Insurance Commissioners interrogatories, signed by Protective's actuaries and sent to insurance regulators, confirm that Protective periodically "redetermined" its COI rates (which it calls "mortality

charges") using not only its current mortality experience, but also "expense and lapse" experience:

> Universal Life policies have mortality charges and expense charges which are not guaranteed. These mortality charges are initially set and **periodically redetermined** using **currently** experienced intercompany and company mortality, along with company experience including but not limited to expense and lapse.

Expense and lapse are not "expectations as to future mortality experience" and therefore are not permissible considerations in determining mortality charges. In fact, Protective later *changed* its policy form to permit it to consider lapse (also called "persistency" by Protective) and expenses: "Monthly cost of insurance rates will be determined by the Company, based on its expectations as to future mortality experience, investment earnings, **persistency, and expenses** (including taxes)." (emphasis added).  But under the policy language for the Subject Policies, Protective is prohibited from doing that. By using "expense and lapse" in reviewing COI rates during the Class Period, Protective has breached the terms of the Subject Policies.

## <u>CLASS ACTION ALLEGATIONS</u>

40.    This action is brought by Plaintiff individually and on behalf of a class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.  The class—referred to as the "COI Overcharge Class"—consists of:

> All owners of universal life (including variable universal life) insurance policies issued or administered by Protective Life Insurance Company, or its predecessors in interest, that provide that cost of insurance rates are determined based on expectations as to future mortality experience,

and that were subjected to monthly cost of insurance deductions on or after August 13, 2012.

The COI Overcharge Class does not include defendant Protective, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

41.    The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable.  The identities and addresses of class members can be readily ascertained from business records maintained by Protective.

42.    The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

43.    The Plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the class.

44.    Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

45.    Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

46.    This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact

affecting the class predominate over any individualized issues. Those common questions that predominate include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether Protective's actions in failing to calculate and determine monthly COI rates based on expectations as future mortality experience for COI Overcharge Class violated the terms of those form policies;

(c)     whether Protective based its COI charges on factors other than expectations as to future mortality experience;

(d)     whether Protective breached its contracts with Plaintiff and members of the class;

(f)     whether Protective's expectations as to future mortality experience have improved; and

(g)     whether Plaintiff and members of the class are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

47.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek

legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)    when Protective's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)    this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)    without a class action, many class members would continue to suffer injury, and Protective's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)    this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

48.    Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff and the COI Overcharge Class.

49.    The Subject Policies are binding and enforceable contracts.

50.     Protective breached its contracts with Plaintiff and members of the COI Overcharge Class every month during the Class Period by determining and deducting COI charges calculated using COI rates that were not based on Protective's expectations as to future mortality experience.  These overcharges include, but are not limited to, the excess COI charges that Protective deducted by not using its then-current mortality expectations to determine rates, and failing to reflect mortality improvement in those rates.

51.     Plaintiff and the members of the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Protective's conduct as set forth herein.

52.     As a direct and proximate cause of Protective's material breaches of the policies, Plaintiff and the members of the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFOR, Plaintiff and the COI Overcharge Class pray for judgment as follows:

1.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding Plaintiff and the class compensatory damages;

3.    Awarding Plaintiff and the class pre-judgment and post-judgment interest, as well as costs; and

4.    Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.


Dated:  October 2, 2019                   Respectfully submitted,


*/s/ Steven G. Sklaver*
Steven G. Sklaver
(admitted *pro hac vice*)
(California State Bar # 237612)
Attorneys for Plaintiff
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com

**OF COUNSEL:**
Barry A. Ragsdale (RAG003)
Meghan A. Salvati (SAL035)
**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
P.O. Box 55727
Birmingham, AL 3525505727
Tel.: (205) 930-5100
Fax: (205) 930-5101

bragsdale@sirote.com
msalvati@sirote.com

Glenn C. Bridgman
(admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:  310-789-3150
gbridgman@susmangodfrey.com

Seth Ard
(admitted *pro hac vice*)
Ryan Kirkpatrick
(admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:  212-336-8330
Fax:  212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

Alejandra Salinas
(admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002-509
Tel:   713- 651-9366
asalinas@susmangodfrey.com

*Attorneys for Plaintiff*